Yes, Your Honor. Huey Cotton appearing on behalf of the appellants. Your Honor, they're Just a minute. You represent OSAKI? Both appellants? All three. All three. Excuse me. All appellants. Yes. Okay. I just want to make sure. Thank you. What we're confronted with here is the, there are basically two lines of cases. One in which the SEC seeks both to disgorge profits and seeks restitution on behalf of investors. The principal case where that combined relief is sought is the commission in this case. By contrast, the cases in which the commission seeks only to disgorge profits as opposed to profits and restitution, that line of cases is controlled in this circuit by initially Haitley back in 1993 and the most recent iteration of that would be the alliance leasing case. But in all the cases where restitution is not part of the relief sought by the commission, a basic disgorgement or profit analysis takes place or should take place. It didn't take place in this case. The disgorgement analysis should be how much did the defendants take in? How much was returned to the investors? How much additional profit or interest was received by the monies while in the hands of the defendants? And obviously that would be subject to disgorgement. And you subtract the subtraction. There was no analysis. There was no accounting. And let's face it, in the majority of these cases, you don't have any detail. You have a defendant asserting the Fifth Amendment right. You have a defendant refusing to provide an accounting. That is not this case. In this commission who pulled together a lot of that information, a lot of the detail needed to separate out expenses overhead from profit and easily separate out the compensatory elements that might be returned to. So assuming you say, you know, you can you can do the numbers to come down with some kind of net. The question is, why should you do that? Well, in this case, because the difference is over 125 million dollars. But that's not an answer. I mean, why? So what? I mean, why should you? I mean, the question is, oh, the reason is to avoid it. Oh, the question is, who should bear that loss? The reason you do it is to avoid a double recovery. Well, in this case, you have a receiver appointed who's charged with recovering the restitutionary monies for the investors. He set about that task. Now, separate from that, you have the commission asking for the same money from this defendant. I'm not sure I understand something here. I had thought that there was a lot of discretion in these matters and that it was equitable. And I'm thinking, suppose I'm a crook and I raise ten million dollars from investors for a totally crooked scheme. I pay myself a salary of four million dollars and I pay business expenses for million dollars on jetting around and enjoying myself. It seems to me that the SEC can then require me to return all ten million, not just the ten million minus the five million of expenses, because the expenses were self-enrichment that burdened the investors instead of benefiting them. You need to undertake that analysis. In the first bank court case, that was exactly the situation where you had an executive essentially milking the assets. That's not what we have here. Why not? What we have here is monies invested or loaned to a venture capital firm, Citadel Capital, and that money in turn invested with entities over which these defendants or these parties had no control. You're talking about a situation where the defendants have full control over those assets. Here you don't have that. And when you don't have control, that's when the receiver comes in on behalf of those investors to get disgorgement of the money from those entities which end up with the money. In this instance, they're called the Citadel portfolio companies. In the instance where you have defendants or parties who are just milking the assets, giving themselves gratuitous compensation, lavishing great lifestyles on themselves, in those instances, the money hasn't gone anywhere. It's stayed with the parties who are targeted. And in that instance, it makes sense to isolate that money and order all of it disgorged back to the commission. But in those instances, what you find when you go through these cases, the commission typically asks for disgorgement and restitution. And the court, this court in the first Pacific Bank Court case, sided with the commission because it asked for both things, both forms of relief. In this case, they did not ask for restitution on behalf of the investors. The only request the commission made on behalf of these investors was that the civil penalty be allocated to the investors. So what we're looking at is of the $137 million. Well, Citadel is one of the defendants here. Yes, it is. But Citadel. The money that goes to Citadel is not like an innocent third party. Well, the money that went to Citadel did not stay at Citadel. If it had, we'd be in a different discussion. The money that went to Citadel was invested into entities over which Citadel had no control. So what you're saying is that money was lost through bona fide investments and bona fide entities that are not controlled by the defendants. No, what I'm saying, not that it was lost, but I'm saying that there's a different part of the remedial scheme to be used to recover that money. In this instance, and the commission had two choices, either appoint a receiver, which they did, or seek restitutionary relief as part of their disgorgement, which they did not. So the receiver, which is why we made a number of examples on the record to show that the receiver is setting about to recover those monies on behalf of the investor. So the money is not lost. The money is being recovered as part of the overall remedial scheme. It's just not money that the commission is entitled to. With respect to, and the reason it's significant is because, one, that's $100 million. Then there's a separate $25 million where the expenses are not expenses of somebody lavishing or living a lavish lifestyle. Instead, these are expenses that are undisputed overhead in the operation of the effort of the business unit. The business is trying to generate the profit that would be disgorged. That's the money that goes into overhead and is typically discounted. And if you look most specifically at how the commission has handled... Sorry, typically. Typically in what case? I'll give you the four clearest examples. In this circuit, Alliance Leasing, Haitley, and the most detailed example would be a Southern District of New York case, which cited in the material as the inorganic recycling case. In that case, the commission did a complete schedule of the expenses and overhead to be discounted. They did a complete schedule of the money paid out that had come in but paid out and not subject to disgorgement. And based on that analysis, the court was then able to separate out and do the deductions and the crediting that was necessary. It did not happen in this case. Another case, 1993 case from this circuit, the Interlink case, where the court asked all the right questions when it says, what happened to the money? But the defendants refused to answer. That's the typical case. They refused to give any of this detail, any of this evidence. And in those instances, it makes sense for the court to demand a full and complete disgorgement. But that's not what happened here. Here you had an overwhelming amount of detail and disclosure concerning what happened to this money, all the way down to how catering was handled. And if I could, Your Honor, just like a second to address the Ichinosubu aspect of the appeal. Mr. Ichinosubu is not one of the joint and several defendants. In the case, he was assessed a $409,000 disgorgement amount. And all he's asking is that apply the alliance leasing analysis to his situation. Where in alliance leasing, they say, this court says, if you can show that you're entitled to a credit based on the assets already frozen, then you get that credit and the amount to be disgorged is reduced. We offer, in substantial part of the case, Counsel, you're way over your limit. So understand that everything you've briefed is preserved and argued. But if you wish to make further clarification in just a moment, go ahead. All right. Just very briefly. $156,000 condominium has been frozen. Separated out by the receiver. All Mr. Ichinosubu is saying is, under alliance leasing, I'm entitled to a credit. Let me have it. And the court ignored that request. Thank you, Counsel. We'll hear from the SEC. Mark Pennington for the SEC. I appreciate the court hearing us this way, and I apologize for not being there. I'd like to start with a factual premise of the case, and then I'd like to talk about the way the commission and the courts have analyzed the case. The most important thing to bear in mind is that investors in this case were told that all of their money was going to be invested in latex gloves or receivables, and not a single penny of it was. And therefore, in our view, and I think in the view of the district court, every single dime that they got was fraudulently obtained, and none of it was used. Excuse me, Counsel. I had trouble understanding some of your words. Could you say that again? Not one dime. How's that, Your Honor? Can you understand me? Yes, Your Honor. More clear now. Not one dime of the money was spent as it was supposed to be spent. Therefore, in the commission's view, every dime that they received was ill-gotten gain. Now, what is the established law on how you handle this situation? In the commission's view, and the courts have agreed for many years now, the first step is you ascertain how much of the money that the defendant received is ill-gotten gain. And here, as I say, it's every dime. Then they're ordered to discourage that. That becomes a judgment against them. When two or more people have acted together to commit the fraud, the courts have had the discretion to impose the liability jointly and severally. So you end up with a joint several judgment against, in this case, three of the defendants. Then the commission will attempt to collect that money. In this case, as in many cases, the district courts appointed a receiver, and the receiver gathers the money. Because of these other investments, it's a more complicated case. Wait a minute. I'm missing something here. As I understand it, they say that they invested $99 million with Citadel, and Citadel invested the $99 million in various firms as venture capital. Correct. But some of that investment still has value. But you're saying none of that should be subtracted. Is that right? No, that's not correct. I'm saying first you figure out how much they received improperly. Then you go to collect the judgment. Say if they'd invested the money and they had $131 million in these other companies, then that would be property of Citadel, correct? Because as the investor in the other companies, the receiver would gather that money up, and then the disgorgement judgment would be paid that way. So you subtract the current value of those investments when you collect the judgment. I mean, that's what collecting the judgment will constitute largely in this case, is going around and figuring out what assets Citadel has, since most of the money was put into Citadel. So whatever is recovered by the receiver that's in Mr. Osaki's possession, or if there was any in Wallenbrock's possession, or Citadel's investments, that goes in to be applied against the disgorgement judgment. And then the next step — So in that sense, excuse me, in that sense, there's no double recovery? No, there's no double recovery. There's one judgment, and the receiver's collecting the judgment. And then the next step for the district court ultimately will be, he'll have to decide what to do with whatever money he recovers. And unfortunately in this case, I don't think there's any chance there's going to be $131 million recovered. I'm told that they've got less than $10 million now. So then the commission will go back to the district court with a plan to distribute the recovered assets to the investor. So the receiver is a collector of assets. The district court will distribute the assets, typically on a pro rata basis, to the identified investor. And that's what will happen with the money. So there's no possibility of double recovery in the commission's procedure with regard to the receiver. If there's a private class action brought, there's a possibility, you know, if the private class action recovered all the money, then you'd have the possibility of a double recovery. But what the district court has typically done there is deduct from the recovery in the private suit, if by some chance the whole amount was recovered, the amount of the disgorgement that's been distributed. So the defendants will never be held liable for more than paying out what they got. Let me make sure I understand that. Citadel is a defendant too.  That's correct. So whatever money was invested by Citadel and is an asset of Citadel's is going to be recovered and credited against what Osaki and the other individuals owe. If I got that right? That's right. It's not, I'm sure I'm mispronouncing his name. He's not jointly and severally liable. One of them is different. Yes. Osaki and Wallenbrock and Citadel are all jointly and severally liable. And $3 million, I believe, was recovered from Osaki's bank account. That will be applied to the judgment. One of the, sort of a related point that is made. I get it. So you're saying you don't have to subtract the Citadel assets because Citadel is a defendant. Those assets will be collected, and Osaki and that other person will get the benefit, Wallenbrock or something. That's exactly right. OK, now I've got it. Mr. Pennington, you seem to be ignoring one of the points that Mr. Cotton tried to make. I think it was part of his discussion about the difference between discouragement and restitution. But he was arguing about being entitled to some kind of an offset for legitimate expenses. Well, you haven't addressed that at all. I haven't addressed that at all. Well, no, I was working my way through that. I'm not ignoring it, but I thought the most important thing was to get this overall framework of how the process works. OK. Now, the cases that he cites, and let me start with the Haley case, because that's the case that's in this circuit, and I think it illustrates the proper analysis. In the Haley case, the three defendants who were defendants in the Haley case had entered into a scheme whereby $55,000 was improperly received. But under the agreement under which the scheme was organized, $50,000 was committed from day one to go to another party who wasn't in the lawsuit. So the court said in figuring out, the first step is to figure out what's the ill-gotten gain. Because at the time the transaction was entered into, the Haley's only could have received $5,000 from day one. That's their ill-gotten gain. And the money that never could have come to them is not ill-gotten gain. And the same thing with Alliance Leasing. There they were selling securities fraudulently. They had hired independent contractors and had agreed to pay the independent contractors, who were not defendants in the case, 15 percent of the proceeds from day one. So they only ever stood to receive 85 percent of the money. And the court said, so you don't count the money that they never could have gotten under the arrangement that was entered into. We don't have anything like that here, because Osaki got all the money, and he could do whatever he wanted with it, and he pretty much did whatever he wanted with it. Now, after he got it, he spent $11 million that he spent to Citadel for what is identified as business expenses. But our view is he had the money in his pocket. He was supposed to spend that on latex gloves receivable. Instead, he gave it to Citadel. He should not be allowed to deduct that from his disbursement. That doesn't reduce the amount of ill-gotten gains that he got. He just misspent that. And he should not be – there are no legitimate overhead expenses here, because there was no legitimate business being conducted by these people in the sense that – not that they didn't invest in other things, but in the sense that they told the investors, here's what we're going to do with the money, and they didn't do that. So all of the money should come back. That's the $11 million that went to Citadel. Now, on the $25 million that Osaki kept or Wallenbrock kept, the accountant for the receiver, Mr. Bigg, who is an affidavit in the record, if you look at excerpts of record page 316, he says there's $25 million Wallenbrock kept or Osaki kept. It's all intermingled. Osaki spent some of it on himself. He spent some of it on business expenses. He just can't sort it out. And I believe the defendants had an accountant who tried to make a different accounting of some of the money. But the basic bottom line is – I mean, this is sort of a hood stuff. Osaki took the $25 million, and he spent it in ways you can't account for, and he said, well, that money's gone, so I shouldn't have to account for it. But he had the benefit of every dime. He had the $25 million. Even if it had gone for his business expenses, it benefited him. He thought it was worthwhile to spend the $25 million on his business expenses. And he didn't spend it to help the investors, because he didn't spend it the way he was going to tell the investors he was going to spend it. He gave $11 million to a Citadel. Presumably, he got $11 million worth of benefit on the money he spent on Citadel, or not presumably, but giving him the benefit of the doubt. So there's $36 million. He spent it the way he wanted to. He thought it was worth $36 million. He should not now be able to come to court and say, well, I don't have this money anymore. He wasn't entitled to it in the first place, and he should not deduct it from the judgment. So that's our view on the expenses. Those, I think, are the two major points in the case, the joint and several liabilities, and how to do that in court, and then this claim that they should be allowed to deduct the expenses. And those are my – unless the Court has further questions. I do have a question. The cases frequently use the term ill-gotten gain, but they also say that the discouragement remedy is to return – How is the term profits being used in these cases? Well, it depends on the cases. And this Court, in the first Pacific Bank Court case, discussed that because there was a discussion about – well, it was about restitution versus discouragement, but it's a related point. In a legitimate business, perhaps the profits would be what's left over after legitimate expenses. But in a case where the whole thing was a scam and every dime was taken, in our view, the profits are every dime and the ill-gotten gains are every dime because they just took the money. I mean, this could have almost been brought as a conversion case. So in some cases, but not in this case, you'll have a circumstance where you want to – where there are legitimate expenses. And Haley, perhaps, is an analogous situation, or perhaps Alliance Leasing, where you have a legitimate business and the fraud is not a complete – the transaction is not a complete sham, and you've got to try to figure out – I think it's the Vollmer case where the Court said you separate the legitimate part out from the illegitimate. And so then it would make a difference to talk about profits being ill-gotten gains. So you're saying here there are no legitimate expenses. Not a dime of it. All the expenses are either for personal enrichment or for basically running a scam. That's exactly right. Okay. On the frozen condominium example, the individual who's not jointly and severally liable, to the extent that his $400,000-plus obligation is enforced, does the condominium count against that? Sure. Sure. Any assets that are received, I mean, that are his assets, will ultimately be applied against the judgment. So he will get credit. Sure. And all the defendants, for any money that's been seized, everybody will get credit. The point we make is first you figure out how much you owed, but because there was pre-judgment seizure of assets, the Court has possession of them. But ultimately there will be a settlement, and whatever assets they got from any of these people, whether it's bank account money or condominiums or whatever, will be applied to the judgment. And unless it's enough to satisfy the whole judgment, they'll owe what's left over. Thank you, Counsel. Thank you. Your time was used up, but go ahead and take 30 seconds. There's a question as to whether Mr. Osaki was using, had advised the investors that the money would be used for the startup companies and the Citadel. I refer the Court to the excerpt of record at pages 548 through 550, where it specifically notes that that was part of what the investors were advised of, and that's why the expenses should be discounted, and that's why the Citadel monies should be separated. And I submit to the Court that Counsel for the Commission has not told you about the distinction that itself, that the Commission itself draws between cases where they seek restitution and profit disgorgement and cases where they only seek profit disgorgement, such as this one. Thank you, Counsel. SEC v. Mr. Osaki is submitted. We are adjourned until 9 a.m. Okay. All rise. Court is adjourned.
judges: Kleinfeld, Tashima, Fisher